United States District Court
Southern District of Texas
**ENTERED**
September 26, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANDREW PRESTON SHANNON, (Inmate #00216563) | § § § § § § § § § § § § § | |
| *Plaintiff*, | | |
| vs. | | CIVIL ACTION NO. H-20-4245 |
| TROY NEHLS, *et al.*, | | |
| *Defendants*. | | |

## MEMORANDUM OPINION AND ORDER

While he was a pretrial detainee at the Fort Bend County Jail, Andrew Preston Shannon filed a complaint against multiple officials of the Jail, alleging that he was denied adequate medical care in violation of his civil rights. (Dkt. 1). After the screening required under 28 U.S.C. § 1915A, the Court ordered service of process on Health Services Administrator Durelle Cardiff, Dr. James Davis, Nurse Practitioner Dawn Simons, and Nurse Shirley Rabius.[1] (Dkt. 29). The defendants responded with a motion for summary judgment, including extensive exhibits. (Dkt. 65). Shannon did not file a response to the motion, and his time to do so has now expired. Having reviewed the motion and its exhibits, all matters of record, and the

---

[1] The Court dismissed Shannon's claims against former Sheriff Troy Nehls, Captain Quam, Sergeant Solberg, and Sergeant Reiser because Shannon did not allege facts showing that any of them were personally involved in Shannon's medical care. (Dkt. 29).

applicable law, the Court grants summary judgment in favor of the defendants and dismisses this action for the reasons explained below.

## I. BACKGROUND

On December 14, 2020, Shannon filed a § 1983 action against the defendants, alleging that he was being denied medical care for a hernia and for a shoulder condition that led to frequent dislocations and extreme pain. (Dkt. 1). He alleges that Administrator Cardiff and Dr. Davis refused to consider surgery for either his hernia or his shoulder condition, stating that the conditions were not emergencies and did not require immediate surgery. (*Id.* at 4-5). Shannon alleges that Nurse Simons "played a role" in the decisions to refuse to permit him to have surgery. (*Id.* at 5). He alleges that Nurse Rabius repeatedly refused to schedule appointments for him and told him that he would not get the surgery he needed while he was in jail. (*Id.*) Shannon alleges that the decisions by each of these defendants denied him adequate medical care for his hernia and his shoulder condition and resulted in unnecessary pain and suffering in violation of his rights as a pretrial detainee under the Fourteenth Amendment. (*Id.* at 6). He asks the Court to order the jail to authorize his shoulder surgery.[2] (*Id.* at 13). He also seeks both compensatory and punitive damages. (*Id.* at 17).

---

[2] The Court notes that Shannon was released from jail in February 2022. (Dkt. 23). His release renders his request for injunctive relief moot.

In his More Definite Statement, (Dkt. 7), and Supplemental More Definite Statement, (Dkt. 28), Shannon provides additional details about his hernia, his shoulder condition, and his reasons for requesting surgery. Shannon alleges that his shoulders had dislocated "countless times" before he was arrested and confined to the Jail in August 2018. (Dkt. 7, p. 1). He alleges that his left shoulder dislocated for the first time in 2016 and his right shoulder dislocated after a gunshot in 2017. (*Id.*). When he was treated for the right shoulder dislocation in 2017, an unknown orthopedic surgeon at Texas Medical Center told him that if his shoulders continue to dislocate, he would need surgery. (*Id.*). That surgeon also told Shannon that insurance would cover only a portion of the cost. (*Id.*). Shannon alleges that he was "working through the red tape with his primary physician" for the shoulder surgery when he was arrested and incarcerated. (Dkt. 28, p. 3).

Shannon alleges that he first reported the problem with his shoulders to the defendants in July 2020. (Dkt. 7, p. 2). He alleges that by that time, he had suffered multiple dislocations of each shoulder while in jail, which had decreased the mobility in his shoulders and had begun interfering with his daily activities. (*Id.*). Shannon requested that the jail schedule him for surgery on his shoulders. (*Id.* at 3). Dr. Davis agreed that every dislocation can worsen Shannon's shoulder condition, but he told Shannon that surgery to repair the condition is considered elective and so would not be performed while Shannon is in jail. (*Id.* at 4). Shannon explained that

3

an outside orthopedic surgeon had already recommended the surgery, but Dr. Davis still maintained that the surgery was elective. (*Id.*).

Shannon admits that the defendants later arranged for X-rays of both shoulders, as well as an MRI. (*Id.* at 4-5). Based on the MRI findings, the defendants arranged for Shannon to see an outside surgeon, Dr. Nguyen, about his shoulder condition. (*Id.* at 5). Dr. Nguyen reviewed Shannon's medical records and the MRI and told Shannon that he would not recommend surgery at that time, but that Shannon would likely need surgery within two years. (*Id.*). Dr. Nguyen referred Shannon to Dr. Warnock, another orthopedic surgeon, for an opinion on the specific surgery necessary to make the repairs. (*Id.*). A short time later, the defendants arranged for Dr. Warnock to review Shannon's medical records. (*Id.* at 8). Based on that review, Dr. Warnock stated that he did not believe that surgery was medically necessary at that time. (*Id.*).

Shannon disagrees with the medical recommendations made by Dr. Nguyen and Dr. Warnock because the physician he saw in 2017 had recommended that he have surgery. (Dkt. 28, pp. 4-5). Shannon alleges that Dr. Nguyen and Dr. Warnock were "not following professional medical standards" but instead were "cooperating with the Jail and Wellpath to fulfill their budgetary goals." (*Id.* at 5). Shannon alleges that the defendants should not have followed Dr. Nguyen and Dr. Warnock's

4

recommendations but instead should have "followed the law" that requires the jail to provide adequate medical care. (*Id.* at 6).

Concerning his hernia, Shannon alleges that he first noticed it in May 2019, and he immediately sought medical help. (Dkt. 7, p. 3). He reported the condition to the defendants multiple times, but he was not diagnosed with an inguinal hernia until several months later. (*Id.* at 9). Over a one-year period, the hernia grew to about five times its original size. (*Id.*). In the summer of 2020, Shannon sought to have the hernia surgically repaired, but Nurse Rabius told him that he could not be referred to a specialist at that time due to the COVID-19 pandemic. (*Id.* at 10). Dr. Davis later told Shannon that hernias are not surgically repaired unless there is an emergency. (*Id.* at 11). Nurse Rabius told Shannon the same thing. (Dkt. 28, p. 9). After Shannon filed a grievance, he was scheduled for an ultrasound of the hernia, which showed that the hernia was not incarcerated.[3] (Dkt. 7, p. 10). Because the non-incarcerated hernia did not present a medical emergency, Nurse Simons told Shannon that he was not a candidate for surgery. (*Id.*). Shannon disagrees with this recommendation because he is suffering pain and discomfort and is concerned that he will have complications if the hernia is not repaired. (Dkt. 28, pp. 9-10).

---

[3] An incarcerated, or strangulated, inguinal hernia occurs when a portion of the bowel extends through the hernia and the blood supply to the bowel becomes blocked. *See* Hernia, https://en.wikipedia.org (last visited Sept. 21, 2023).

The defendants answered Shannon's complaint, (Dkt. 34), and provided him with their initial disclosures. (Dkt. 39). Shannon then filed multiple motions for extension of time, seeking additional time to serve his own disclosures and participate in discovery. (Dkts. 40, 46, 50). The Court granted the first two motions for extension of time, (Dkts. 44, 48), and granted the third motion in part. (Dkt. 51).

Shannon appealed the partial denial of the third extension of time. (Dkt. 52). After that appeal was dismissed for lack of jurisdiction, (Dkts. 58, 59), the defendants filed their joint motion for summary judgment, including extensive exhibits on June 26, 2023. (Dkt. 62). These exhibits include copies of Shannon's jail medical records and his grievance records. (Dkts. 59-1 through 59-23). The defendants assert that these records show that they promptly responded to Shannon's requests for medical care, albeit not in the way he would have liked. (Dkt. 65, pp. 3-24). They ask the Court to grant their motion and dismiss Shannon's action. (*Id.* at 24).

The defendants mailed their motion for summary judgment to Shannon on June 26, 2023. (*Id.* at 25). Shannon had thirty days from that date in which to file a response. (Dkt. 29, p. 3). On July 25, 2023, the defendants filed an amended certificate of service, noting that the motion had inadvertently been sent to an incorrect address, but stating that it had been remailed to Shannon via Federal

Express on that date. (Dkt. 63). Despite having ample time to have filed a response, Shannon has not done so.

## II. LEGAL STANDARDS

### A. Actions Under 42 U.S.C. § 1983

Shannon brings his complaint against the defendants under 42 U.S.C. § 1983. "Section 1983 does not create any substantive rights, but instead was designed to provide a remedy for violations of statutory and constitutional rights." *Lafleur v. Texas Dep't of Health*, 126 F.3d 758, 759 (5th Cir. 1997) (per curiam); *see also Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To state a valid claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Gomez v Galman*, 18 F.4th 769, 775 (5th Cir. 2021) (per curiam). The dispute in this case focuses on the first element: whether the defendants violated Shannon's constitutional rights.

### B. Summary-Judgment Standard

The defendants responded to Shannon's complaint with a motion for summary judgment. "Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton,* 572 U.S. 650, 656-57 (2014) (per curiam)

7

(quoting FED. R. CIV. P. 56(a)). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.,* 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-25 (1986)). "A fact is material if its resolution could affect the outcome of the action." *Dyer v. Houston,* 964 F.3d 374, 379 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.,* 627 F.3d 134, 134 (5th Cir. 2010)). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Westfall v. Luna,* 903 F.3d 534, 546 (5th Cir. 2018) (cleaned up).

When considering a motion for summary judgment, the Court must view all evidence and draw all inferences "in the light most favorable to the [nonmoving] party." *Tolan,* 572 U.S. at 657 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)); *see also Dyer,* 964 F.3d at 380. However, if record evidence clearly contradicts the plaintiff's version of events, the Court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Waddleton v. Rodriguez,* 750 F. App'x 248, 253-54 (5th Cir. 2018) (per curiam) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)). Moreover, the Court will not consider the nonmoving party's conclusory allegations and unsubstantiated assertions as evidence. *See Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Instead, after viewing the offered evidence in the light most favorable to the

nonmoving party, summary judgment may be granted only if no genuine disputes of fact exist and no reasonable jury could return a verdict for the nonmoving party. *See, e.g., Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 399 (5th Cir. 2000).

### C. *Pro Se* Pleadings

Because Shannon is proceeding *pro se*, the Court construes his filings liberally, subjecting them to "less stringent standards than formal pleadings drafted by lawyers[.]" *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). But even under this lenient standard, *pro se* litigants must still "abide by the rules that govern the federal courts." *E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 484 (5th Cir. 2014) (quoting *Frazier v. Wells Fargo Bank, N.A.*, 541 F. App'x 419, 421 (5th Cir. 2013)). "*Pro se* litigants must properly plead sufficient facts that, when liberally construed, state a plausible claim to relief, serve defendants, obey discovery orders, present summary judgment evidence, file a notice of appeal, and brief arguments on appeal." *Id.* (footnotes omitted).

### III. DISCUSSION

The Eighth Amendment protects convicted prisoners from cruel and unusual punishment arising from prison officials' deliberate indifference toward a prisoner's physical injury or pain. *See Estelle v. Gamble*, 429 U.S. 97, 105 (1976). The same protection extends to pretrial detainees, like Shannon, under the Fourteenth

Amendment. *See Hare v. City of Corinth, Miss.*, 74 F.3d 633, 643 (5th Cir. 1996) (en banc).

When a pretrial detainee's claim for a denial of medical care is based on a jail official's acts or omissions, the detainee must show that the jail official "had subjective knowledge of a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference." *Cope v. Cogdill*, 3 F.4th 198, 206 (5th Cir. 2021) (quoting *Estate of Henson v. Wichita County, Tex.*, 795 F.3d 456, 464 (5th Cir. 2015)) (cleaned up), *cert. denied*, 142 S. Ct. 2573 (2022). "To show an official was deliberately indifferent, a plaintiff must demonstrate that the official is aware that an 'inmate[ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" *Davis v. Lumpkin*, 35 F.4th 958, 963 (5th Cir. 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). This deliberate indifference standard is "extremely high." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). "Deliberate indifference is more than mere negligence or even gross negligence." *Brown v. Callahan*, 623 F.3d 249, 255 (5th Cir. 2010). "Actions and decisions by officials that are merely inept, erroneous, ineffective or negligent" do not amount to deliberate indifference. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998). Neither do "[u]nsuccessful medical treatment, acts of negligence, . . . medical malpractice" or "a prisoner's disagreement with his medical treatment, absent

10

exceptional circumstances." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (cleaned up). Instead, the prisoner must show that the prison medical provider "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (cleaned up).

In support of their motion for summary judgment, the defendants have filed Shannon's medical records from the time period between his first complaint concerning the hernia and the filing of this action. These records show that on May 5, 2019, Shannon reported "what appears to be a cyst" in his pubic area, and he requested that it be evaluated. (Dkts. 62-16, p. 26; 62-23, p. 35). On May 7, 2019, Nurse Rabius examined Shannon but found no cyst or other raised area around his pubic area. (Dkt. 62-21, p. 32). Shannon reported that the cyst "comes and goes," and Nurse Rabius told Shannon to let the medical clinic know if it came back. (*Id.*). Nine days later, Shannon again reported the presence of a cyst, but it was not present when Nurse Rabius examined him. (*Id.*) The same events occurred in August 2019, when Shannon complained of a lump, but nothing was found on examination. (*Id.*).

On August 29, 2019, Nurse Simons examined Shannon during his annual health check. (Dkt. 62-23, p. 5). While she did not see a lump during the examination, she documented that she believed, from Shannon's description, that the lump was an inguinal hernia. (*Id.*). Shannon denied having any pain or bowel

11

complications from the lump. (*Id.*). Nurse Simons concluded that the hernia was not incarcerated, so no treatment was needed at that time. (*Id.*). In December 2019, Shannon reported that the hernia was not protruding, and he did not request any treatment. (Dkt. 62-21, p. 33).

Shannon did not request medical treatment for his hernia again until July 11, 2020, when he also requested treatment for the issue with his shoulders dislocating. (Dkts. 62-21, p. 34; 62-23, p. 49). He was seen the next day by Nurse Miller. (Dkt. 62-21, p. 34). Regarding his hernia, Shannon told Nurse Miller that the hernia had "gotten worse," but that he had no complaints about it; he just wanted to "get it fixed before something happens." (*Id.*). On July 18, 2020, Shannon asked for an update on his request for hernia surgery, and he was told that no outside appointments were being scheduled at that time due to the COVID-19 pandemic. (*Id.*). On July 21, 2020, Nurse Rabius examined Shannon and saw an "egg size" hernia in his right groin. (*Id.* at 35). Shannon denied any pain or discomfort and reported that the hernia goes away when he lies down. (*Id.*). When Shannon asked again about surgery, he was again informed that no outside appointments were being scheduled due to COVID-19. (*Id.*).

Despite being aware of the restrictions in place due to the COVID-19 pandemic, Shannon complained on July 24, 2020, that Nurse Rabius "refused to schedule me to see the doctor." (Dkt. 62-20, p. 4). Also, despite having told Nurse

Rabius three days earlier that the hernia was not causing him any pain or discomfort, Shannon now reported that the hernia sometimes "twists in an awful pain." (*Id.*). He also requested medical attention for his "torn shoulders." (*Id.*). He asserted that other inmates were receiving necessary medical treatment and that he did not believe his requested surgeries were "elective." (*Id.*).

Based on Shannon's complaints of shoulder pain and dislocations, he was scheduled for X-rays of both shoulders. (*Id.* at 4, 6). The X-rays, taken July 29, 2020, showed no fractures, dislocations, or subluxations, the joints articulated normally, the cortical margins were intact, and the soft tissue planes were normal. (Dkt. 62-4, p. 21). On July 31, 2020, Dr. Davis saw Shannon and reported the X-ray results. (Dkt. 62-23, p. 6). In a forty-minute appointment, Dr. Davis "extensively discussed treatment for both conditions" and explained that the surgical procedures Shannon was requesting were considered elective because "there is currently no urgent or emergent indication for surgery for either condition." (*Id.*).

When Shannon continued to complain about shoulder dislocations and pain, Nurse Simons scheduled him for an off-site MRI of his shoulders, and she also scheduled an ultrasound of his hernia. (Dkts. 62-20, p. 27; 62-23, pp. 14-15). The ultrasound, which was performed on August 21, 2020, confirmed the presence of an inguinal hernia. (Dkt. 62-4, p. 9). The MRI, which was performed on August 25, 2020, confirmed the presence of an "impaction deformity," a bony lesion, and a

labrum tear in Shannon's shoulders. (Dkt. 62-3, pp. 22-24). On September 1, 2020, Nurse Simons set up a referral to an outside orthopedic surgeon due to the MRI findings of Shannon's shoulders. (Dkt. 62-21, p. 35).

On September 2, 2020, Nurse Simons saw Shannon and discussed the MRI and ultrasound findings with him. (Dkt. 62-13, p. 37). She explained that his hernia was not operable at this time. (*Id.*). She also told him of the referral to the orthopedic surgeon and explained that it would be up to the surgeon to determine whether his shoulders required surgery or some other therapy. (*Id.*).

On September 11, 2020, Dr. Nguyen of ADS Orthopaedic examined Shannon and diagnosed "instability" in both shoulders with recurrent dislocations. (Dkt. 62-3, p. 10-11). Dr. Nguyen explained that Shannon would likely benefit at some point from a Latarjet procedure[4] to repair the damage from the recurrent dislocations, but that he was not sure how feasible the procedure would be while Shannon was in jail. (*Id.*). Because Dr. Nguyen did not do Latarjet procedures, he referred Shannon to Dr. Warnock. (*Id.*).

On September 15, 2020, Nurse Simons told Shannon that she would be referring his case to an outside orthopedic specialist for review. (Dkt. 62-21, p. 35). Administrative Cardiff was present during the discussion. (*Id.*). On September 25,

---

[4]The Latarjet procedure involves a bone graft and muscle/tendon transfer. *See* Latarjet procedure, https://en.wikipedia.org (last visited Sept. 22, 2023).

14

2020, Nurse Simons sent Shannon's medical records to Dr. Warnock for his recommendations for treatment. (*Id.* at 36). That same day, Dr. Warnock informed Administrator Cardiff that Shannon's condition was "not emergent or medically necessary at this point and [he] would not perform surgery on him." (Dkts. 62-21, p. 36; 62-23, pp. 12-13).

During all this time, Shannon was prescribed Tylenol for pain; however, he routinely refused this medication. (Dkts. 62-4, pp. 1, 3-5, 10-13, 15-19, 22, 24-25; 62-3, pp. 2-3, 6-9, 13-21, 25; 62-2, pp. 6-11, 13, 15-23). When Nurse Simons learned that Shannon was actually hoarding Tylenol pills, she stopped the prescription and explained that he could obtain Tylenol from the jail commissary if he needed it for pain. (Dkts. 62-13, p. 37; 62-21, p. 36).

Shannon's medical records are consistent with his factual allegations concerning the defendants' responses to his requests for care. But far from showing that the defendants were deliberately indifferent to Shannon's concerns, the records show that every time Shannon complained to the defendants, they responded. Shannon points to no evidence that contradicts the medical records on this point or that raises disputed issues of fact concerning whether the defendants ignored his complaints, refused to treat him, intentionally treated him incorrectly, or displayed a wanton disregard for his serious medical needs. Instead, the summary judgment evidence shows that Shannon simply disagrees with the medical treatment

15

recommendations made by Drs. Davis, Nguyen, and Warnock and followed by jail officials. This is insufficient to establish that the defendants violated Shannon's constitutional rights.

Moreover, Shannon's contention that he was entitled to receive his requested surgeries while he was in jail simply because he wanted them done at that time is incorrect. Shannon was entitled to receive adequate medical care while in jail, which does not necessarily include undergoing medically unnecessary surgeries. *See, e.g., Cadena v. El Paso County*, 946 F.3d 717, 729 (5th Cir. 2020) (pretrial detainee was not entitled to medical care that was "the best that money could buy" as long as the jail was responsive to her medical needs); *Shepherd v. Dallas County*, 591 F.3d 445, 455 n.3 (5th Cir. 2009) ("Pretrial detainees are not entitled under the Constitution to the best medical care available or to the level of medical care that may be available to persons who are not detained or incarcerated, provided the level of medical care they receive does not seriously deprive them of their basic human needs."); *Martin v. Bowman*, 48 F.3d 1216, 1995 WL 82444 (4th Cir. Feb. 24, 1995) (per curiam) (denial of arthroscopic knee surgery deemed elective by outside medical providers was not a violation of a pretrial detainee's constitutional rights); *Washington v. Medical Staff, T.C.S.O.*, No. A-06-CA-130-SS, 2006 WL 2052848, at *4 (W.D. Tex. July 21, 2006) (denial of surgery to repair an injured thumb determined to be non-

emergent and elective by outside medical providers was not a violation of a pretrial detainee's constitutional rights).

The medical records before the Court conclusively rebut Shannon's allegations of deliberate indifference. *See Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) (per curiam) ("Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference."). The defendants are entitled to summary judgment in their favor.

## IV. CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1. The defendants' motion for summary judgment, (Dkt. 65), is **GRANTED** and this action is **DISMISSED with prejudice**.
2. Any other pending motions are **DENIED as moot**.
3. Final judgment will be separately entered.

The Clerk will provide a copy of this Order to the parties.

SIGNED at Houston, Texas, on _____Sept 26_____, 2023.

_____
DAVID HITTNER
UNITED STATES DISTRICT JUDGE